**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x

In re:                                                      **FOR PUBLICATION**

                                                            Chapter 11

Black and White Stripes, LLC, *et al.*,[1]

                                                            Case No. 20-12439 (MG)

                        Debtors.                            (Jointly Administered)

-------------------------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER DENYING DEBTORS' AMENDED APPLICATION TO EMPLOY CUSHNER & ASSOCIATES, P.C., AS DEBTORS' ATTORNEYS

*A P P E A R A N C E S :*

CUSHNER & ASSOCIATES, P.C.
*Proposed Counsel to Black and White Stripes, LLC*
*and Eastern Canal Film, LLC*
399 Knollwood Road, Suite 205
White Plains, NY 10603
By:    James J. Rufo, Esq.
        Todd S. Cushner, Esq.

BEDERSON LLP
*Subchapter V Trustee to the Debtors*
347 Mount Pleasant Avenue
West Orange, NJ 07052
By:    Charles N. Persing, CPA/CFF, CVA,
                        CIRA, CFE

DENTONS US LLP
*Counsel to Royal West Property Corp.*
*and Fosso Bianco Holdings Limited*
1221 Avenue of the Americas
New York, New York 10020
By:    Charles E. Dorkey III, Esq.
        Lauren M. Macksoud, Esq.
        Stephen G. Della Fera, Esq.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: (1) Black and White Stripes, LLC (3533) and (2) Eastern Canal Film, LLC (8127).

OFFICE OF THE UNITED STATES TRUSTEE
201 Varick Street, Room 1006
New York, New York 10014
By:     William K. Harrington, Esq.
        Paul K. Schwartzberg, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court in this jointly administered case[2] is the Amended Application of

Black and White Stripes, LLC ("B&W") and Eastern Canal Film, LLC ("Eastern," and with

B&W, the "Debtors") to Employ Cushner & Associates, P.C. (the "Cushner Firm" or the

"Firm"), as Debtors' bankruptcy counsel.[3] ("Retention Application" or the "Application," ECF

Doc. # 28-3.)  In support of the Application, the Debtors have submitted: (1) "Amended

Affidavit Pursuant to Section 329 of the United States Bankruptcy Code and Rule 2016 of the

Federal Rule [sic] of Bankruptcy Procedure," executed by James J. Rufo ("Mr. Rufo") (the

"Rufo Affidavit," ECF Doc. # 28-1) and (2) "Subchapter V of Chapter 11 of the Bankruptcy

Code Retainer Agreement" (the "Retainer," ECF Doc. # 28-2).[4]

On November 2, 2020, Royal West Property Corp. ("Royal West") and Fosso Bianco

Holdings Limited ("Fosso Bianco," and with "Royal West," the "Creditors"), B&W's two largest

creditors, filed an objection (the "Creditor Objection," ECF Doc. # 32) to the Retention

Application on the basis of (1) the Cushner Firm's former representation of the Principals

(defined below) and (2) the Cushner Firm's "questionable conduct in a related state court

---

[2]     B&W is the debtor in case number 20-12439 and Eastern is the debtor in case number 20-12440.  (*See*
B&W ECF Doc. # 1; Eastern ECF Doc. # 1.)  Pursuant to this Court's Order Directing Joint Administration of
Chapter 11 Cases, "[t]he docket in Black and White Stripes, LLC (20-12439) should be consulted for all matters
affecting this case." (ECF Doc. # 43 ¶ 5.)  Accordingly, unless otherwise specified, references are to the docket in
case number 20-12439.

[3]     A corresponding amended retention application was filed in the Eastern case as well (Eastern ECF Doc. #
23).  References to the Retention Application encompass the applications filed in both cases.

[4]     Retention of Debtors' counsel, of course, must be based on section 327 of the Bankruptcy Code and Fed. R.
Bankr. P. 2014, and not section 329 and Rule 2016, as Mr. Rufo seemed to believe.

litigation." (Creditor Objection ¶¶ 2–3.) On November 4, 2020, the United States Trustee (the "UST") filed a separate objection (the "UST Objection," ECF Doc. # 34) to the Retention Application. On November 27, 2020, the Debtors filed their Reply to Opposition of Debtors' Amended Applications to Retain Cushner & Associates, P.C., as Counsel to the Debtors. ("Reply," ECF Doc. # 50.)

With the issues having been fully briefed, the Court held a telephonic hearing (the "Hearing") on November 30, 2020, to consider the Retention Application. After hearing from the parties, the Court took the matter under submission. For the reasons explained below, the Court **DENIES** the Retention Application.

## I.   <u>BACKGROUND</u>

The Debtors' principals are Marco La Villa ("Marco") and Mauro La Villa ("Mauro," and with Marco, the "La Villas" or the "Principals");[5] each is a managing member and fifty-percent membership interest holder of both B&W and Eastern. (*See* List of Equity Security Holders, ECF Doc. # 12; Supplemental Declaration of Mauro La Villa in Further Support of Motion ("Mauro Declaration"), Adv. Proc. No. 20-01247, ECF Doc. # 18 ¶¶ 1–2.) The La Villas develop, write, direct, and produce films and other media for B&W and Eastern. (Mauro Declaration ¶ 22.) B&W is a "Sport Entertainment and Content Production Company," and its primary assets are the rights associated with BLACK AND WHITE STRIPES: THE JUVENTUS STORY (the "Film"), a documentary film about the Italian soccer team, Juventus. (*Id.* ¶¶ 7, 10.) Eastern is an "Entertainment and Creative Services Production and Development Company." (*Id.* ¶ 8.) As discussed more fully below, the Debtors financed the Film in part through loans from their

---

[5]      Marco and Mauro are brothers and are referred to by their first names in order to avoid confusion; no disrespect is intended.

uncle Bruno Mastroprimiano ("Bruno") and their cousin Damien Mastroprimiano ("Damien").

Bruno and Damien are insiders as that term is defined by section 101(31)(B)(vi) of the

Bankruptcy Code.  (*See id.* ¶ 11.)

On October 15, 2020 (the "Petition Date"), B&W and Eastern each filed a voluntary

petition for relief under Subchapter V of Chapter 11 of the Bankruptcy Code.  (ECF Doc. # 1.)

On October 16, 2020, Charles N. Persing was appointed the Subchapter V Trustee in both

chapter 11 cases.  (*See* Notice of Appointment of Trustee in a Chapter 11 Subchapter V Case,

ECF Doc. # 3.)

### A.    The Debtors' Request for Injunctive Relief to Stay State-Court Actions Against the Debtors' Principals Is Denied

On October 20, 2020, B&W and Eastern filed an adversary proceeding (the "Adversary

Proceeding," Adv. Proc. No. 20-01247) seeking to enjoin Royal West and Fosso Bianco from

continuing several New York state court actions (the "State Court Actions")[6] against the Debtors

and the Principals for a period of 180 days from the issuance of the injunction.  (*See* Complaint

for Injunctive Relief (the "Adversary Complaint") ¶ 1, Adv. Proc. No. 20-01247, ECF Doc. # 1.)

On October 21, 2020, this Court issued an Order to Show Cause and Temporary Restraining

Order why an order should not be entered pursuant to 11 U.S.C. §§ 105(a) and 362(a) extending

the automatic stay to the State Court Actions against the Principals.  (*Id.*, ECF Doc. # 4.)

---

[6]    Two actions remain pending in state court.  *See Fosso Bianco Holdings Ltd. v. Screenplay Bungalow One, LLC and Eastern Canal Film, LLC*, Index No. 653811/2020 (N.Y. Sup. Ct. 2020) (seeking $325,390.96); *Royal West Property Corp. v. Black and White Stripes, LLC, Eastern Canal Film, LLC, Marco La Villa, and Mauro La Villa*, Index No. 654004/2019 (N.Y. Sup. Ct. 2019) (seeking $1,606,000.00).  Two related actions have already resulted in judgments being entered against the Debtors and their Principals.  *See Fosso Bianco Holdings, Ltd. v. Eastern Canal Film, LLC, Marco La Villa, and Mauro La Villa*, Index No. 651495/2020 (N.Y. Sup. Ct. 2020) (judgment entered in the amount of $251,653.45 against Eastern; judgment entered in the amount of $125,826.72 each against Marco and Mauro); *Fosso Bianco Holdings, Ltd. v. Black and White Stripes, LLC*, Index No. 654240/2019 (N.Y. Sup. Ct. 2019) (judgment entered in the amount of $246,218.36 against B&W).

Royal West and Fosso Bianco filed an opposition (the "Injunction Opposition") arguing that Debtors' bankruptcy filings were merely an attempt by the La Villas to escape their own liability, rather than a legitimate effort to reorganize the Debtors.  (*Id.*, ECF Doc. # 12 ¶¶ 56–57.) In support of the Injunction Opposition, Royal West and Fosso Bianco submitted the Declaration of Bruno Mastroprimiano (*id.*, ECF Doc. # 13), the Declaration of Damien Mastroprimiano (*id.*, ECF Doc. # 14), and the Declaration of Stephen G. Della Fera (the "Della Fera Declaration," *id.* ECF Doc. # 15).  Attached to the Della Fera Declaration are thirty exhibits, including, most notably: (1) a Loan Deal Memo (the "Royal West Agreement," *id.*, ECF Doc. # 15-4); (2) a promissory note (the "SBO Note," *id.*, ECF Doc. # 15-5) made by Screenplay Bungalow One, LLC ("SBO" or "Screenplay Bungalow One"), in favor of Fosso Bianco, with Eastern as surety; (3) a promissory note (the "B&W Note," *id.*, ECF Doc. # 15-6) made by B&W in favor of Fosso Bianco, with Eastern, Marco, and Mauro as sureties; (4) the Film and Creative Services Agreement between B&W and Eastern ("Creative Services Agreement," *id.*, ECF Doc. # 15-14); (5) images of canceled checks drawn on Eastern's account and payable for rent (*id.*, ECF Doc. # 15-15); and (6) reports by Eastern of services rendered to B&W ("Service Reports," or, referring to one of the Service Reports individually, "Service Report," *id.*, ECF Doc. # 15-17).

Following a hearing on November 2, 2020, the Court entered an order vacating the restraining order that had stayed the State Court Actions against the Principals and denying the Debtors' request for injunctive relief.  (*Id.*, ECF Doc. # 19 at 2 (noting that "[i]f the Debtors' Principals want the benefit of the automatic stay, they will need to commence their own bankruptcy proceedings").)  On November 25, 2020, the State Court (defined below) in one of the State Court Actions amended a prior discovery order to reflect that additional discovery would proceed only with respect to the individual defendants while the entity defendants would

remain subject to the automatic stay. *Royal West Property Corp. v. Black and White Stripes, LLC, Eastern Canal Film, LLC, Marco La Villa, and Mauro La Villa*, Index No. 654004/2019, NYSCEF Doc. # 50.

### B.   General Background and Transactions

An understanding of the inter-Debtor relationships, as well as the relationships among the Principals, the Debtors, and the Cushner Firm, is necessary for a resolution of the Retention Application.

#### 1.   SBO Note

On August 1, 2018, pursuant to the SBO Note, Fosso Bianco advanced $298,845.00 (the "SBO Principal") to Screenplay Bungalow One, a non-debtor affiliate of the Debtors managed by Marco and Mauro. (*See* SBO Note.) Eastern (but not the La Villas) is a surety under the SBO Note. (*See* SBO Note at 4 § 13 ("[Eastern] hereby irrevocably and unconditionally agrees that if the principal sum of an advance together with accrued interest has not been paid hereunder by the Maturity Date the Surety [Eastern] shall pay the unpaid balance on demand from [Fosso Bianco].").) The SBO Note was executed August 1, 2018, with a maturity date of August 1, 2020, and an interest rate of 6 percent per annum with no interest payable until March 1, 2019. (*Id.* § 3.) The SBO Note is governed by the laws of Alberta, Canada, with consent to jurisdiction in both Alberta and New York. (*Id.* § 9.) It is signed by Marco, Mauro, and Damien. (*Id.* at 6.)

Following SBO's default on the SBO Note, Fosso Bianco filed a motion for summary judgment in New York Supreme Court seeking payment of the SBO Principal plus accrued interest—for an aggregate of $325,390.96—together with additional interest accruing at 6 percent since the maturity date of August 1, 2020, as well as attorneys' fees and costs. (*See* Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment in Lieu of Complaint (the "Fosso Bianco SJ Motion"), 653811/2020, NYSCEF Doc. # 3 at 1, 6.) This case

does not name Marco or Mauro individually.  Fosso Bianco alleges that it demanded payment

from SBO and Eastern on August 4 and 6, 2020, and that neither defendant has repaid any

amount owed under the SBO Note.  (*Id.* at 2.)  As such, Fosso Bianco argues that it is owed a

sum certain based upon an instrument for the payment of money only and is therefore entitled to

summary judgment in lieu of complaint pursuant to CPLR § 3213.  (*See id.* at 4.)  Fosso Bianco

also argues that it is owed attorneys' fees by SBO pursuant to the terms of the SBO Note.  (*Id.* at

5; SBO Note § 10.)[7]  On October 19, 2020, Dentons US LLP ("Dentons"), on behalf of Fosso

Bianco, submitted a letter to the court requesting that the court take no action with respect to the

Fosso Bianco SJ Motion in light of Eastern's bankruptcy case and section 362(a) of the

Bankruptcy Code.  (Letter / Correspondence to Judge (the "FBH Letter"), 653811/2020,

NYSCEF Doc. # 11.)  As of December 4, 2020, there has been no subsequent activity on the

state court docket since the filing of the FBH Letter.

     2.  <u>B&W Note</u>

Pursuant to an additional promissory note, the B&W Note, dated April 5, 2018, Fosso

Bianco made three advances, each in the amount of $70,000 (on April 1, 2018, April 23, 2018,

and August 1, 2018) to B&W; each advance was to be repaid on or before six months from the

date of the advance with interest accruing at a rate of 7 percent per annum.  (*See generally* B&W

Note; *see* Injunction Opposition ¶¶ 11–12.)  Eastern and the La Villas are sureties under the

B&W Note, with Marco and Mauro each individually obligated to repay up to 50 percent of any

unpaid principal and interest.  (*See* B&W Note § 13 ("Marco La Villa and Mauro La Villa shall

each be liable to pay to [Fosso Bianco] such unpaid sums up to an amount of no more than fifty

---

[7]     The Fosso Bianco SJ Motion incorrectly cites section 13 of the SBO Note, but section 10 of the SBO Note provides that "Borrower [SBO] shall pay all costs and expenses of the collection of indebtedness evidenced by this note, including reasonable attorneys' fees and court costs in addition to other amounts due, without protest."  (SBO Note § 10.)

(50%) each of the applicable advance together with accrued interest thereon.").)  None of the

$210,000 aggregate principal and accrued interest has been repaid.  (Injunction Opposition ¶ 12.)

Fosso Bianco sued for payment of the B&W Note in July 2019,[8] and a default judgment

was entered on January 16, 2020, in favor of Fosso Bianco in the amount of $246,218.36.  (*Id.* ¶

14.)  B&W lists this amount in its schedules as a "disputed" amount owed to Fosso Bianco.

(ECF Doc. # 7-2 at 2.)  Following the grant of default judgment against B&W, Fosso Bianco

brought an action against Eastern and the La Villas as sureties.[9]  (Injunction Opposition ¶ 15.)

On October 7, 2020, default judgment was again entered in favor of Fosso Bianco in the amount

of $251,653.45, with Eastern responsible for the full judgment amount and Marco and Mauro

each responsible for 50 percent (i.e., $125,826.72 each).  (*Id.*)  This $251,653.45 is listed in

Eastern's schedules, also as a "disputed" amount.  (*See* Eastern ECF Doc. # 10-2 at 1.)

3.  Royal West Agreement

To finance the Film, B&W entered into an agreement with Royal West for equity

financing in the amount of $436,090.00 (referred to in the Royal West Agreement as the

"Principal Amount") and a loan in the amount of $985,000.00 (the "Loan Amount"), bearing an

interest rate of 10 percent per annum, with Eastern and the La Villas as sureties.  (Mauro

Declaration ¶¶ 11–12; Royal West Agreement at 12–13 §§ 2–3.)  Under the Royal West

Agreement, Royal West was also to receive an additional payment equaling 15 percent of the

Principal Amount.  (Royal West Agreement at 14, Exhibit A, *Allocation of Receipts*, ¶ (f)

("Sixth, to the Investor [Royal West] . . . until they have received an additional fifteen percent

(15%) on the Principal Amount . . . .").)  In contrast to the surety provisions of the SBO Note and

---

[8]     *Fosso Bianco Holdings, Ltd. v. Black and White Stripes, LLC*, Index No. 654240/2019 (N.Y. Sup. Ct. 2019).

[9]     *Fosso Bianco Holdings, Ltd. v. Eastern Canal Film, LLC*, Index No. 651495/2020 (N.Y. Sup. Ct. 2020).

B&W Note—which simply oblige the sureties to make payment in the event of the primary

obligor's default—as sureties under the Royal West Agreement, Eastern and the La Villas agreed

that, until Royal West had received 100 percent of Loan Amount and interest, they would "pay

fifty [percent] (50%) of any profit participations received by the Sureties from any existing or

future motion picture or other business venture in which any Surety is actively involved to

[Royal West] to be applied one hundred percent (100%) to pay down the Loan Amount and then

the Interest."  (Royal West Agreement at 13 § 3.)

| Summary of Claimed Amounts | | | | | |
|---|---|---|---|---|---|
| Claimant | Against | Instrument | Amount | Status | NYS Case No. |
| Fosso Bianco | B&W | B&W Note | $246,218.36 | Default judgment entered | 654240/2019 |
| Fosso Bianco | Eastern as surety | B&W Note | $251,653.45 | Default judgment entered | 651495/2020 |
| Fosso Bianco | Marco & Mauro as sureties | B&W Note | $125,826.72 each | Default judgment entered | 651495/2020 |
| Fosso Bianco | SBO (and Eastern as surety) | SBO Note | $325,390.96 | Motion for summary judgment pending | 653811/2020 |
| Royal West | B&W (with Eastern, Marco, and Mauro as sureties) | Royal West Agreement | $1,606,000 | Pending, stayed as to B&W and Eastern | 654004/2019 |

4.  Creative Services Agreement

The Creative Services Agreement includes two components: (1) a "Film & Creative

Service Deal Memo," entered into as of June 22, 2011 (the "Deal Memo," Creative Services

Agreement at 10–11), and (2) a "Film & Creative Service Agreement," entered into as of

October 1, 2015.  (*Id.* at 2–9.)  Both components of the Creative Services Agreement were

entered into by and between Eastern as the "Creator" and B&W as the "Company," with Marco

signing each on behalf of Eastern and Mauro signing each on behalf of B&W.  (*Id.* at 5, 11.)

Schedule A to the Creative Services Agreement includes a list of the services to be provided

(e.g., film production, home video/Blu-ray production, sales & distribution).  (*Id.* at 6–8.)

Schedule A also sets out the fees to be paid to the Creator.  (*Id.* at 9.)  The fees are expressed

both in terms of a standard billing rate and a "50% DISCOUNTED <u>BILLED</u> RATE."  (*Id.*)  It is

not entirely clear why B&W was to be billed at a discounted rate, nor is it clear how much

money Eastern actually received pursuant to the Creative Services Agreement.  Eastern did,

however, write numerous checks to cover Marco's personal rent over an eight-year period.  (*See*

Injunction Opposition ¶ 46; Della Fera Declaration, Ex. O (producing sixty-three pages of

cancelled rent checks drawn on Eastern's bank account).)

### 5.  Service Reports

The Service Reports describe various production services allegedly provided by Eastern

to B&W.[10]  (*See generally* Service Reports.)  Two such reports have been provided to the Court

as attachments to the Della Fera Declaration.  (*Id.*)  The first report is labeled "#001" and details

services rendered through September 30, 2011.  (*Id.* at 1.)  This initial Service Report shows a

balance due of $45,000.00 (reflecting "Total Fees and Disbursements for this period" of

$90,000.00, but subject to the Creative Services Agreement's 50% discount).  (*Id.* at 2.)  The

second report, labeled "#022,"[11] details additional production services rendered through

---

[10]    The Creditors assert in their Injunction Opposition that the Service Reports "appear to have been created by Debtors/the La Villas during the [Royal West Action], as their metadata indicates they were created in May 2020." (Injunction Opposition ¶ 28.)  A review of the Service Reports themselves, however, makes clear that the Debtors were not trying to hide the relatively recent creation of the Service Reports.  The first Service Report includes a prominent disclaimer: "This report is a non-exhaustive list of services provided during the time period covered by this report.  Due to restrictions with COVID, certain additional information regarding services provided cannot be accessed at this time.  This report may be supplemented at a later date." (Service Reports at 3.)  Thus, it is not just the "metadata" that reveals the Service Reports' recent vintage.  The Service Reports, while detailing past services rendered, were generated, or at least conspicuously modified, during the litigation process.

[11]    It is unclear why the only Service Reports produced during the Adversary Proceeding were numbers 001 and 022, with all interim reports being omitted.

December 16, 2016.  (*Id.* at 4.)  This second Service Report shows a balance due of $990,000.00 (reflecting "Total Fees and Disbursements for this period" of $90,000.00, again subject to the Creative Services Agreement's 50% discount, added to an outstanding "Previous Balance" of $945,000.00).  (*Id.* at 5.)

C.    **The Cushner Firm's State-Court Representation of the Debtors and Principals**

The Cushner Firm represented B&W, Eastern, and the Principals in an action (the "Royal West Action") that was originally filed by Royal West on July 12, 2019, in New York State Supreme Court, and subsequently assigned to the Commercial Division (the "State Court"). ("Royal West Complaint," Index No. 654004/2019,[12] NYSCEF Doc. # 2.)  The Royal West Complaint asserts six causes of action including: (1) "Breach of Fiduciary Duty/Accounting" (*id.* at 4); (2) "Fraudulent Concealment by Fiduciary" (*id.* at 5); (3) "Breach of Contract" (*id.* at 6); (4) "Quantum Meruit" (*id.*); (5) "Unjust Enrichment" (*id.* at 7); and (6) "Breach of Obligation To Perform As Surety Against Eastern Canal Film, LLC, Marco La Villa; And Mauro La Villa." (*Id.*)

The defendants in the Royal West Action were initially represented by the law firm Larocca Hornik Rosen & Greenberg LLP ("LHR&G").  (*See* Verified Answer with Affirmative Defenses, NYSCEF Doc. # 9.)  Over a year later, pursuant to a stipulation entered August 20, 2020, LHR&G withdrew as counsel for all defendants in the Royal West Action.  (NYSCEF Doc. # 16).  Royal West and Eastern (the "LLC Defendants") were given until September 11, 2020, to retain replacement counsel or be held in default.  (*Id.* ("[I]f replacement counsel for the LLC Defendants (which cannot appear pro se) does not e-file a notice of appearance and

---

[12]    Subsequent references to the Royal West Action will omit the Index Number but use "NYSCEF" citations to avoid confusion with citations to the bankruptcy dockets.

participate in the September 11 call they will be held in default and plaintiff may move for a

default judgment against them . . . .").)

On September 4, 2020, the Cushner Firm entered an appearance in the Royal West

Action.  (Notice of Appearance, NYSCEF Doc. # 17.)  The Firm represented the Debtors and the

La Villas pursuant to a "Limited Retainer Agreement" (the "State-Court Retainer").  (Reply, Ex.

A, ECF Doc. # 50-1).  Paragraph one of the State-Court Retainer provides, in relevant part:

> 1.  We shall represent you in the foregoing action on September 11,
>     2020, and we shall also provide such other legal advice, counsel,
>     including review of the entire litigation file and services as may,
>     in our opinion, be necessary or proper in connection with that
>     matter.

(*Id.* ¶ 1.)  The Cushner Firm was paid an "initial retainer of $2,500.00" pursuant to the State-

Court Retainer.  (*See id.* ¶ 3.)

On September 11, 2020, the State Court held a hearing in the Royal West Action and

extended deadlines (from August 19, 2020, to September 25, 2020) for certain discovery, *i.e.*, for

the parties to finalize an ESI protocol and for the defendants to produce Eastern's bank

statements.  (*See* Status Conference Order, NYSCEF Doc. # 19.)  On September 25, 2020, and

after having been made aware of the Cushner Firm's "forthcoming motion for leave to

withdraw," the State Court subsequently extended the deadline for producing Eastern's bank

statements to October 9, 2020, with a deadline of September 30, 2020, for requesting any records

not in the defendants' possession.  (Status Conference Order (the "State Court Order"), NYSCEF

Doc. # 22 at 1.)  The State Court gave defendants a strict directive that failure to comply with the

amended schedule would result in the State Court striking the defendants' answer and permitting

the plaintiff to move for entry of a default judgment.  (*Id.*)

On October 1, 2020, the Cushner Firm filed its Affirmation in Support of Order to Show

Cause to be Relieved as Attorney of Record ("Withdrawal Affirmation," NYSCEF Doc. # 25).

The most relevant paragraph of the Withdrawal Affirmation provides: "Without disclosing any attorney-client privileges, significant differences have arisen between my firm and the Defendants as to the communication breakdown and an irrevocable breach has developed." (*Id.* ¶ 6.)

After requesting withdrawal, but prior to the State Court granting it, the Cushner Firm filed Mauro La Villa's Affidavit of Compliance with the State Court Order and produced the Eastern bank statements that were the subject of that order. (NYSCEF Doc. ## 28–31.) On October 13, 2020, Royal West's counsel, Charles Dorkey III, of Dentons, submitted a letter to the State Court arguing that "a default is justified" and alleging that production of Eastern bank records did not "strictly comply" with the State Court Order as they had failed to include, with the exception of a single monthly statement, any records from 2019 or 2020.[13] (Letter / Correspondence to Judge (the "Dentons Letter"), NYSCEF Doc. # 32.) On October 14, 2020, the State Court issued an order requiring Marco and Mauro to submit a letter explaining the failure to "strictly comply" with the State Court Order and reminding them that "the LLC Defendants" (i.e., B&W and Eastern) would be held in default if they failed to retain replacement counsel by October 16, 2020. (NYSCEF Doc. # 36.)

On October 15, 2020, the State Court entered an Order relieving the Cushner Firm as counsel. (NYSCEF Doc. # 37). On the same date, Mr. Rufo of the Cushner Firm, filed a Notice of Bankruptcy Case Filing in the State Court. (Notice of Bankruptcy (Post RJI), NYSCEF Doc. # 39.) On November 25, 2020, the State Court issued an updated discovery order requiring the La Villas to begin complying with the ESI protocol as to their personal email accounts by mid-

---

[13]    Ultimately, it appears that there were no 2020 records as the account was closed in 2019. (Dentons Letter at 2.) The Dentons Letter also raised complaints with respect to the partial redaction of account numbers, which hindered efforts to track disbursement of the funds advanced by Royal West. (*Id.*)

December, with review of corporate emails stayed unless ordered by this Court.  (NYSCEF Doc.

# 50.)

### D.      The Cushner Firm's Bankruptcy Court Retention Application

B&W's pending Retention Application seeks to retain the Cushner Firm as bankruptcy

counsel to the Debtors.  (Retention Application at 1.)  The Retention Application replaces a prior

retention application that was filed on October 19, 2020, and subsequently withdrawn.

("Withdrawn Application," ECF Doc. # 17.)  The primary changes to the Retention Application

are to the accompanying Rufo Affidavit, beginning with the deletion of the following paragraph:

> 4.      Neither I, nor the Firm or any attorney at the Firm
> has any connection with the debtor, its creditors or any other party
> in interest herein or their respective attorney except as described
> below.  Furthermore, neither I, nor the Firm or any attorney at the
> Firm is a pre-petition creditor of the Debtor.

("Withdrawn Rufo Affidavit," ECF Doc. # 17-1 ¶ 4.)  Paragraph 4 was clearly inaccurate as it

omits any disclosure of the Cushner Firm's state court representation of the Debtors *and* the

Principals.  The Retention Application replaces that deleted paragraph with the following:

> 3.      Prior to the date of the Debtor's chapter 11 filing on
> October 15, 2020, the Firm represented the Debtor, the related
> debtor and debtor-in-possession, Eastern Canal Film, LLC (case no.
> 20-12440 (MG), and the Debtors' principals Marco La Villa and
> Mauro La Villa (collectively, the "Principals") in state court
> litigation matter in the Supreme Court of the State of New York,
> County of New York, Royal West Property Corp. v. Black and
> White Stripes, LLC et al, *Index No. 654004/19* (the "State Court
> Action") pursuant to a general retainer for which The Firm received
> on or about September 2, 2020.

> 4.      The Firm represented the Debtors and Principals in
> the State Court Action from September 3, 2020 until October 15,
> 2020.  The Firm was relieved as counsel for all parties pursuant to
> an Order signed by the Honorable Jennifer G. Schecter, J.S.C., dated
> and entered on October 15, 2020.

14

> 5.    On the date that the state court order relieving the
> Firm was entered, and prior to the date of the Debtors' October 15,
> 2020 chapter 11 filing, the Debtors and Principals balance owed to
> the Firm was ZERO.

(Rufo Affidavit ¶¶ 3–5.)  Mr. Rufo's affidavits accompanying both the Retention Application

and the Withdrawn Application each include the following paragraphs:

> 13.    A search of the Firm's computer server containing all
> existing and prior matters and contacts has been conducted in which
> we compared a list of the debtors [sic] known creditors, *members*,
> directors, officers and financial institutions.  *No parties were
> identified as former or current clients of the Firm*, or are in any way
> related, such that the Firm could not be opposed to them.

> 14.    In so far as I have been able to ascertain, the Firm is
> a disinterested part [sic] in the [sic] Section 101(14) of the
> Bankruptcy Code, holds no interest nor represents any adverse
> interest to and has no connection to the Debtor, the Debtor's estate,
> its creditors or any other party or interest or their respective
> attorneys and accountants with respect to matters for which the Firm
> is to be engaged, other than as specifically set forth above.

(*Id.* ¶¶ 13–14 (emphasis added); Withdrawn Rufo Affidavit ¶¶ 11–12.)  Finally, the Rufo

Affidavit, as amended, includes the following paragraph, which reiterates material already set

out in paragraph 4, while adding an assertion that the Cushner Firm should not be subject to

disqualification:

> 15.    Despite the Firm having represented the Debtors and
> Principals in the State Court Action from September 3, 2020 until
> October 15, 2020, the [Firm] was relieved as counsel for all parties
> pursuant to an Order signed by the Honorable Jennifer G. Schecter,
> J.S.C., dated and entered on October 15, 2020. Therefore, the Firm
> does not believe that this past relationship would disqualify the firm
> representing this Debtor; as evidenced by the Debtor's retainer
> agreement with the Firm.

(Rufo Affidavit ¶ 15; *see id.* ¶ 4.)

The Retention Application states that "[t]he *Debtor* has paid Cushner & Associates P.C. a

total sum of $10,217.00 in connection with the commencement of this Chapter 11 bankruptcy"

(Retention Application ¶ 10 (emphasis added)), and the Rufo Affidavit states merely that the

Cushner Firm "has received $10,217.00 in connection with the commencement of this Chapter

11 bankruptcy" (Rufo Affidavit ¶ 16).  However, Mauro's *Lar-Dan* Affidavit (the "Lar-Dan

Affidavit," ECF Doc. # 17-3), attached to the Withdrawn Application, makes clear that *Mauro*

"personally paid and guaranteed the fees of $8,500.00 and $1,717.00 for filing fees for a total

sum of $10,217.00 paid in connection with the Chapter 11 case."  (*Id.* at 1.)  The Lar-Dan

Affidavit has not been reattached to the Retention Application and thus exists on the docket only

as an attachment to the Withdrawn Application.

### E.    Creditors and UST Argue that Retention of the Cushner Firm Is Improper

Royal West and Fosso Bianco have filed an objection to the Retention Application, as has

the UST.

#### 1.  Creditor Objection

Royal West and Fosso Bianco object to the Retention Application on two primary

grounds.  (Creditor Objection ¶¶ 2–3.)  First, the Creditors argue that the Cushner Firm's former

representation of the La Villas "presents a direct conflict of interest that should preclude the

Cushner Firm's representation of [the] estate."  (*Id.* ¶ 2.)  The Creditors submit that B&W "is

likely to have adverse claims, for fraudulent conveyances and other wrongful abuse of the

corporate form, against the La Villas, as evidence obtained by Royal West and Fosso Bianco to

date indicates that the Debtor's bank accounts were used to pay for the La Villas' personal

expenses, including taxis, Ubers, hotels, and meals."  (*Id.* ¶ 18.)  The Creditors also argue that

claims by the Debtors against the Principals would be "substantially related" to claims brought

against the Principals in the Royal West Action, in which the Cushner Firm served as counsel to

the Principals and the Debtors.  (*Id.*)  Thus, the Creditors argue, "absent consent of the La Villas,

representation of the Debtor by the Cushner Firm would be a violation of [the New York Code of

Professional Responsibility]."  (*Id.* (citing N.Y. COMP. CODES R. & REGS. tit. 22 § 1200.27 (2007) ("DR 5-108(a)")).)[14]  They submit, however, that even if the La Villas granted a waiver of any professional conduct deficiencies, the more restrictive requirements of section 327(a) would prevent the Debtors' employment of the Cushner Firm.  (*Id.* ¶ 19.)

Second, the Creditors argue that "the Cushner Firm's questionable conduct in [the] related state court litigation raises significant concerns about their ability to faithfully represent the Debtor and its estate in this bankruptcy proceeding."  (*Id.* ¶ 3.)  The Creditors submit that "[the Firm's] appearance [in the Royal West Action] allowed the Debtor and the La Villas to both avoid a potential default and also to obtain additional time to respond to discovery," after which the Firm immediately requested to withdraw as counsel, filed these bankruptcy cases, and argued that the automatic stay protected the La Villas in the Royal West Action.  (*Id.* ¶¶ 8–10.) The Creditors argue that this "questionable conduct," which "raise[s] significant concern over [the Cushner Firm's] ability to faithfully represent the Debtor," warrants denial of the Retention Application.  (*Id.* ¶ 21.)  Finally, the Creditors question B&W's "ability to faithfully engage in the bankruptcy process" and note that appointment of a trustee or examiner may be appropriate in this case.  (*Id.* ¶ 22.)

---

[14]      DR 5-108(a) provides:

   A.  Except as provided in DR 9-101 [1200.45] (B) with respect to current or former government lawyers, a lawyer who has represented a client in a matter shall not, without the consent of the former client after full disclosure:

      1.  Thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client.

      2.  Use any confidences or secrets of the former client except as permitted by DR 4-101 [1200.19] (C) or when the confidence or secret has become generally known.

2.   UST Objection

The UST's arguments track those of the Creditors to the extent that they raise concerns

that "the Debtors' principals may be subject to fraudulent conveyance actions as well as claims

for abuse of corporate form."  (UST Objection at 2.)  The UST includes additional specifics with

respect to these alleged abuses.  (*Id.* ¶ 12.)  Citing the Creditors' Injunction Opposition, the UST

notes that "$180,000 was inappropriately funneled to the La Villas pursuant to an undisclosed

contract in the guise of payments for production, advertising & marketing, sales & distribution

services."  (*Id.* (citing Injunction Opposition ¶¶ 23–24).)  The UST also notes that "[Royal West]

and Fosso Bianco state that canceled checks and bank records show that Marco La Villa used

funds from Eastern Canal to pay his personal rent, in the amount of over $100,000 over an 8-year

period and personal expenditures."  (*Id.*)  The UST also includes the detail that Mauro La Villa

"personally paid and guaranteed the fees of $8,500 and $1,717 . . . in connection with each case."

(*Id.* ¶ 8.)

F.   **Debtors' Counterarguments**

The Debtors, by and through the Cushner Firm, filed their Reply on November 27, 2020.

(*See* Reply.)  The Reply seeks to highlight the limited nature of the Firm's state-court

representation of the Debtors and the Principals, noting that that representation was governed by

a "Limited Retainer Agreement" (the "State-Court Retainer") and that the Firm's representation

was "limited to the facilitation of the production of . . . [Eastern's] bank statements."  (*Id.* ¶¶ 18–

19, 38; *see also* State-Court Retainer, ECF Doc. # 50-1.)  The State-Court Retainer was signed

by Marco La Villa on September 1, 2020.  (State-Court Retainer at 6.)  But by September 24,

Todd S. Cushner ("Mr. Cushner") called counsel for Royal West on behalf of the Cushner Firm

to inform him "that the Cushner Firm would be withdrawing as counsel for the defendants due to

the significance of the State Court Action."  (Reply ¶ 22.)  In a footnote, Mr. Cushner asserts that

18

"[his] decision to withdraw from the State Court Action was largely based on the fact that [he] was still recovering from a bicycle accident . . . that resulted in five (5) broken ribs, a punctured lung and a broken collar bone."[15]  (*Id.* ¶ 22 n.2 (additionally noting "a recently discovered heart issue").)  The Reply goes on to acknowledge some compliance issues with the state-court discovery requirements and to explain these as owing to an "error due to miscommunication." (*Id.* ¶ 31–35.)

The Reply acknowledges that the Creditor Objection raises allegations about the Cushner Firm's "questionable conduct" but asserts that such allegations are "unsupported by fact and contrary to state court orders as demonstrated herewith."  (*Id.* ¶ 39.)  The Reply does not, however, directly address the apparent inconsistency with its prior assertion in the state court regarding its alleged communication breakdown with the Debtors.

The Reply also acknowledges the objections based on the Firm's complicated position with respect to the potential investigation of claims of "fraudulent conveyance and corporate waste" against its former clients.  (*Id.* ¶ 40.)  The Reply argues, however, that such objections "are without merit and are largely based on hearsay and unsupported allegations."  (*Id.* ¶ 41.) Debtors go on to argue that the Creditors' allegations—that the Principals may be subject to fraudulent conveyance actions—are "not derived from fact but are instead hypothetical causes of action that Creditor alleges may exist."  (*Id.* ¶ 49.)  Debtors then wonder: "why didn't Creditor pursue these claims in the State Court litigation prior to the Debtors' bankruptcy filings?"  (*Id.*) Debtors argue that this perceived failure to raise such claims is an indication that such claims do not exist.  (*Id.*)  Moreover, Debtors argue, to the extent that any such claims do exist, special litigation counsel could be retained in the bankruptcy proceeding to investigate them.  (*Id.*)

---

[15]     While the Court is certainly sympathetic to Mr. Cushner's serious and unfortunate medical issues, they do not relieve his firm from its obligations to its clients, to this Court, and to the State Court.

The Debtors' arguments in favor of permitting the Cushner Firm to represent them focus on the brevity and alleged limited scope of the state-court representation. The Debtors' arguments rely heavily on the Second Circuit's decision in *AroChem*. (*See id.* ¶¶ 50–55 (citing *Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610 (2d Cir. 1999)).) In *AroChem,* the court upheld the retention of a firm as special litigation counsel to represent the debtor in claims against certain creditors after the same firm had already represented an individual creditor against many of those same creditors on substantially similar claims to those sought to be asserted on behalf of the debtor. *See AroChem*, 176 F.3d at 630. The Reply notes that "[t]he *AroChem* court . . . distinguished between past representation, and present and future representation." (Reply ¶ 52.) Because the firm in *AroChem* no longer represented the creditor's interests it was sufficiently "disinterested" to represent the debtor as special counsel. (*Id.* ¶¶ 53–54 (citing *AroChem*, 176 F.3d at 623–24).) Thus, the Debtors argue, because the Cushner Firm no longer represents the Principals and such representation was "extremely limited," the Firm is sufficiently disinterested to represent B&W and Eastern. (*Id.* ¶ 55.)

### G.    The Hearing

At the Hearing, both Mr. Cushner and Mr. Rufo argued in support of the Retention Application. (*See generally* Hearing at 21:40–23:35.) Lauren M. Macksoud of Dentons and Paul K. Schwartzberg from the U.S. Trustee's Office opposed the Retention Application. (*Id.*)

The Cushner Firm—as it did in the Reply—argued that its State Court representation of the Debtors and the La Villas was narrow in scope and brief in duration. (*See generally id* at 21:40–52:08.) Mr. Cushner argued that the Firm was "retained on a limited basis to attend a hearing on September eleventh regarding the production of documents for Eastern Canal. . . . [P]aperwork—mostly bank statements for Eastern Canal—[was] filed with the court along with a finalized ESI protocol. That was pretty much my extent of representation of the two Debtors in

the state matter." (*Id.* at 24:33–25:06.) The State-Court Retainer does not support Cushner's

claim that the scope of the retention was narrow. (*See* State-Court Retainer ¶ 1.)

Mr. Cushner was also given an opportunity to explain the apparent discrepancy between

the reasons the Firm gave to the State Court to justify withdrawal and the reasons given for

withdrawal in the Reply. Mr. Cushner stated that "[t]he main reason that [he] moved to be

relieved as counsel was the extent of the state court litigation and the fact that the Debtors had

decided to file for bankruptcy." (Hearing at 26:50–27:02.) He asserted that his understanding—

which was reflected in the Firm's retainer amount of only $2,500.00—was that "all that was

required [of the Cushner Firm] was a hearing on [September] eleventh for the purpose of

providing documentation." (*Id.* at 27:33–28:09.) The Cushner Firm provided that

documentation (consisting of the Eastern bank records), as well as an ESI protocol, but when it

became apparent that the scope of work required would be greater than anticipated, the Cushner

Firm determined that it lacked the ability to handle such an extensive undertaking. (*Id.*)

Mr. Cushner also addressed the issue of potential avoidance claims against the La Villas.

He stated that he "believed that the La Villas are going to cooperate in the bankruptcy and

provide anything that's required. And, as of right now, there are only allegations of

misappropriation or other nefarious activities." (*Id.* at 32:28–32:54.) Mr. Cushner

acknowledged that the Debtors paid the rent on an apartment where Marco was living but

indicated that the apartment was "partly used for the business." (*Id.* at 33:37–33:50.) Mr. Rufo

also argued that "[preference actions] would be preserved in the plan, and, in the event that it is

necessary, [the Cushner Firm] would certainly look to retain special counsel to investigate those

matters." (*Id.* at 38:50–39:00.)

The Creditors' counsel responded that alleged fraudulent transfer claims possibly total as much as $250,000 (by the Creditors' estimates), and that with relatively minimal other assets, it would be impractical for the estate to retain additional counsel. (*Id.* at 40:10–40:15, 41:35–41:44.) With respect to the scope of work required in the State Court, the Creditors argued:

> [T]he entire purpose of that conference [on September 11, 2020] was for the Debtors—the defendants in the state court action—to establish that they would have counsel going forward in that case. The state court had made clear that the defendants would be held in default if they did not have counsel. At no point did the Cushner Firm advise the state court at the September eleventh conference that its representation was limited to that conference. If they had, we are confident that the state court would have considered that non-retainment of new counsel and would have entered the default.

(*Id.* at 44:32–45:03.)[16]

The UST echoed the Creditors' sentiments that, in a relatively small Subchapter V case, the hiring of special counsel to investigate possible fraudulent transfer would be impractical. (*Id.* at 47:48–47:55.) The UST also argued that the Cushner Firm's receipt of retainer amounts from the La Villas call into question the Firm's ability to pursue fraudulent conveyance allegations against the Principals, particularly when combined with the Firm's prior representation of the La Villas individually. (*Id.* at 47:03–47:48.)

## II.   LEGAL STANDARD: RETENTION OF PROFESSIONALS UNDER SECTION 327(a) OF THE BANKRUPTCY CODE

Section 327(a) of the Bankruptcy Code governs the employment of professionals to represent the estate during bankruptcy with court approval. *In re Worldcom, Inc.*, 311 B.R. 151, 163 (Bankr. S.D.N.Y. 2004). Section 327(a) provides as follows:

---

[16] The Creditors also addressed whether counsel other than the Cushner Firm could represent the Debtors given that the Debtors' managing members continue to be the Principals. The Creditors noted that this is "likely the type of case where a chapter 11 trustee would be appropriate." (Hearing at 45:43–45:53.) The Court does not address whether a chapter 11 trustee is necessary or appropriate.

> Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a).

To be retained under section 327(a), professionals must be both disinterested and not hold or represent any interest adverse to the estate. *Vouzianas v. Ready & Pontisakos (In re Vouzianas)*, 259 F.3d 103, 107 (2d Cir. 2001) (citing *AroChem*, 176 F.3d at 621); *see also In re Project Orange Assocs., LLC*, 431 B.R 363, 369 (Bankr. S.D.N.Y. 2010).

The structure of the Bankruptcy Code distills these dual requirements into a single test for analysis of a conflict of interest. Bankruptcy Code § 101(14)(C) defines a "disinterested person" as one who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14)(C). This definition overlaps with the adverse interest requirement of section 327(a), creating a single test for courts to employ when examining conflicts of interest. *Hogil Pharm. Corp. v. Sapir (In re Innomed Labs, LLC)*, No. 07 Civ. 4778(WCC), 2008 WL 276490, at *2 (S.D.N.Y. Jan. 29, 2008) (citing *Worldcom*, 311 B.R. at 164; *In re Granite Partners, L.P.*, 219 B.R. 22, 33 (Bankr. S.D.N.Y. 1998)). A professional must not "hold or represent an interest adverse to the estate." *See AroChem*, 176 F.3d 622–23 (observing that the "adverse interest" language appears in section 327(a) and in the definitions in section 101 regarding disinterested persons and articulating the relevant test as whether an entity "hold[s] or represent[s] an interest adverse to the estate"); *Innomed Labs*, 2008 WL 276490, at *2 (same); *see also Granite Partners, L.P.*, 219

23

B.R. at 33 (observing that "the two prongs of section 327(a) are duplicative and form a single

test to judge conflicts of interest") (internal citation omitted).

The Second Circuit has defined "hold or represent an adverse interest" as

> (1) to possess or assert any economic interest that would tend to
> lessen the value of the bankruptcy estate or that would create either
> an actual or potential dispute in which the estate is a rival claimant;
> or (2) to possess a predisposition under circumstances that render
> such a bias against the estate.

*AroChem*, 176 F.3d at 623 (quoting *In re Roberts*, 46 B.R. 815, 827 (Bankr. D. Utah 1985), *aff'd*

*in part and rev'd in part on other grounds*, 75 B.R. 402 (D. Utah 1987)).

The test is not retrospective; courts only examine present interests when determining

whether a party has an adverse interest. *Id.* at 623–24 (observing that Congress intended only to

proscribe those who presently have an adverse interest from representing a debtor under §

327(a)). Generally stated, the adverse interest test is objective and precludes "any interest or

relationship, however slight, that would even faintly color the independence and impartial

attitude required by the Code and Bankruptcy Rules." *Granite Partners*, 219 B.R. at 33 (quoting

*Roberts*, 46 B.R. at 828 n.26); *see also In re Angelika Films 57th, Inc.*, 227 B.R. 29, 38 (Bankr.

S.D.N.Y. 1998) ("The determination of adverse interest is objective and is concerned with the

appearance of impropriety.") (citation omitted). Further, courts have recognized that a

professional has a disabling conflict if it has "either a meaningful incentive to act contrary to the

best interests of the estate and its sundry creditors—an incentive sufficient to place those parties

at more than acceptable risk—or the reasonable perception of one." *Granite Partners*, 219 B.R.

at 33 (quoting *In re Martin*, 817 F.2d 175, 180 (1st Cir. 1987)). Thus, disqualification is

appropriate "if it is plausible that the representation of another interest may cause the debtor's

attorneys to act any differently than they would without that other representation." *In re Leslie*

*Fay Cos.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994).

24

Courts determine whether an adverse interest exists by examining the specific facts of each case. *AroChem*, 176 F.3d at 623 ("Whether an adverse interest exists is best determined on a case-by-case basis."); *Angelika Films 57th*, 227 B.R. at 39 (stating that "the determination of counsel's disinterestedness is a fact-specific inquiry"). Bankruptcy courts may consider the interests of the estate and the debtor's creditors, accounting for the expeditious resolution of a case when analyzing a retention order. *Vouzianas*, 259 F.3d at 107 (citing *AroChem*, 176 F.3d at 621). Courts, however, must take the requirements of section 327 seriously, as they ensure that a professional fulfils his or her duties in accordance with his or her fiduciary duties to the estate. *Leslie Fay Cos.*, 175 B.R. at 532 ("The requirements of section 327 cannot be taken lightly, for they 'serve the important policy of ensuring that all professionals appointed pursuant to [the section] tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities.'") (alteration in original) (quoting *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir. 1994)). Moreover, courts lack the power to authorize the "employment of a professional who has a conflict of interest." *In re Mercury*, 280 B.R. 35, 55 (Bankr. S.D.N.Y. 2002) (citations omitted).

The existence of claims among multiple debtors (individuals or entities) is scrutinized closely as it relates to representation of multiple parties (creditors and debtors) in reorganization proceedings. A leading treatise notes that "[o]ne problem area that does influence courts to disqualify attorneys or deny their requests for compensation is the potential assertion of intercompany claims among the debtor entities." 3 COLLIER ON BANKRUPTCY ¶ 327.04[5][b] (Richard Levin & Henry J. Sommer eds., 16th ed. 2020). Courts are to review the potential conflicts on a case-by-case basis in connection with claims between debtors. *Id.* (explaining that multiple representation of debtors and/or creditors is not a per se conflict of interest); *see also In*

25

*re Interwest Bus. Equip., Inc.*, 23 F.3d 311, 314 (10th Cir. 1994) (concluding that bankruptcy court did not abuse its discretion in denying employment of single law firm to simultaneously represent interrelated debtors where debtor-creditor relationship was established as a result of prepetition debts "from one estate to the other").

In *In re JMK Construction Group, Ltd.*, this Court denied retention of a single professional by multiple debtors where the debtors in the group of four related cases may have held claims for contribution against one another and where some of the debtors were creditors of others. *In re JMK Constr. Grp., Ltd.*, 441 B.R. 222, 225 (Bankr. S.D.N.Y. 2010). The affiliated debtors in *JMK* (JMK itself, as well as three individual debtors) each filed voluntary petitions in this Court, motivated to do so by substantial judgments entered against each of them following a jury verdict in the district court. *Id.* at 226. There were additional inter-debtor claims that the parties attempted to waive in order to permit retention of the firm by all parties. *Id.* at 227. The debtors also sought to waive rights of contribution against one another that may have arisen out of the jury verdict. *Id.* at 231. In spite of this purported waiver, however, this Court was unable to conclude that there was no longer a right of contribution, with such right of contribution sufficient to disqualify the firm from representation of all debtors. *Id.* at 233.

### III.    DISCUSSION

### A.    The Cushner Firm Is Disqualified from Representing the Debtors Based on Its Representation of the Principals

The Cushner Firm's prior representation of Marco and Mauro precludes it from representing B&W and Eastern in their bankruptcy cases. The Firm has argued that its representation in the State Court was brief and that its scope was adequately cabined by the "Limited Retainer Agreement." (*See* State-Court Retainer ¶ 1.) But this position is belied by the plain terms of the State-Court Retainer, which provides for "review of the entire litigation file

and services as may, in [the Firm's] opinion, be necessary or proper in connection with that

matter."  (*Id.*)  Thus, the scope was not limited by the agreement, and the prior representation of

the La Villas creates, at the very least, a potential conflict that precludes the Cushner Firm's

representation of the Debtors in this case.  Moreover, even on this issue, the Firm's positions

have been inconsistent.  According to the Rufo Affidavit, the Firm's representation in the State

Court was "pursuant to a *general* retainer."  (Rufo Affidavit ¶ 3 (emphasis added).)

As the Creditors' counsel noted at the Hearing, the potential avoidance actions against the

Principals may ultimately be among the estate's most significant assets.  It is therefore

imperative that there be no doubt whether counsel for the Debtors can effectively pursue any

such actions.  The Cushner Firm argues that the viability of avoidance actions is merely

speculative at this juncture.  The evidence adduced by the Creditors so far hardly makes such

claims speculative, but the Cushner Firm's Retention Application is not the time or place to

adjudicate such claims.  Whether an avoidance action would ultimately succeed is not

determinative of whether the Retention Application can be approved.  The determining factor is

whether counsel sought to be retained can proceed faithfully on behalf of the Debtors and in the

best interests of the estate.

The Debtors' Reply relies heavily on the Second Circuit's *AroChem* decision for the

proposition that a prior representation of a creditor is not necessarily disqualifying.  While it is

true that *AroChem* permitted the retention of a firm that had represented one creditor of the

debtor in an action against several of the debtor's other creditors, that situation is easily

distinguishable.  The Debtors acknowledge in their Reply that "*AroChem* involved the retention

of special counsel," but they point out that the Second Circuit nevertheless "analyzed the issues

27

in terms of the requirements of section 327(a)."[17]  (Reply ¶ 50.)  Missing from the Debtors'

analysis, however, is an acknowledgment of just how narrow the proposed scope of

representation was in *AroChem*.  There, the law firm was retained as special litigation counsel to

pursue a specific set of claims against a specific set of defendants, against which it had already

asserted substantially related claims on behalf of the debtor's creditor.  *See AroChem*, 176 F.3d

at 627.

Here, the Debtors seek to retain the Cushner Firm as general bankruptcy counsel in their

consolidated chapter 11 cases, not as special litigation counsel to pursue a narrow claim.  The

Debtors have their analysis backwards.  They argue that, because the Firm's "[pre]petition

representation of the Debtors' Principals was extremely limited," the Firm should not now be

disqualified.  (Reply ¶ 55.)  But part of what made the representation at issue in *AroChem*

permissible was the scope of representation for which the firm was retained *in the bankruptcy

case*.  In *AroChem*, the special litigation counsel was retained to pursue the same narrow issues it

had already pursued on behalf of the creditor.  It was not retained to represent all of the debtor's

interests.  Moreover, *AroChem* was a chapter 7 case where, at the time of the special counsel's

retention, the debtor's only remaining assets were its causes of action.  *AroChem*, 176 F.3d at

615.

The instant chapter 11 case is in its early stages.  It needs reliable bankruptcy counsel to

help shepherd the Debtors through the chapter 11 process and to faithfully proceed on their

behalf in marshalling estate assets and pursuing any claims that the Debtors may have.  The

Debtors argue that any allegations of fraudulent conveyances or abuse of the corporate form are

merely speculative.  The evidence produced thus far (e.g., checks drawn on Eastern's account to

---

[17]    Section 327(e) was inapplicable because the firm sought to be retained had previously represented a
*creditor*, not a *debtor*, as contemplated in section 327(e).

pay Marco's personal rent) is hardly speculative.  At any rate, it is worrying that proposed

counsel would be so dismissive of such claims, especially at this early stage in the case.  And it

is particularly concerning where these potential claims would be against the Cushner Firm's

former clients in the State Court Action, which raised substantially the same issues.  However

brief the Cushner Firm's role in the State Court Action, that representation undermines the

Firm's ability to perform as faithful bankruptcy counsel to B&W and Eastern in their chapter 11

cases.  Accordingly, the Retention Application must be denied.

     **B.**     **The Subchapter V Trustee Must Investigate Certain Important Issues
Affecting Inter-Debtor Relationships**

The arrangement between B&W and Eastern raises a number of concerns.  The Creative

Services Agreement and Services Reports indicate a "balance due," as of December 31, 2016, of

$990,00.00.  (Service Reports at 5.)  The amounts due to Eastern by B&W also apparently reflect

an unexplained 50 percent discount for all billed amounts.  While the Service Reports provide a

summary of production-related services rendered by Eastern, the two Reports that have been

produced only account for $90,000.00 out of the total amount purportedly due.  It is unclear what

the basis is for the other $900,000.00 claimed in the Service Reports.  It is also unclear how

much Eastern has received in the aggregate pursuant to the Creative Services Agreement or what

amounts, if any, it may still be owed by B&W.  Many checks drawn on Eastern's bank account

were paid for Marco's personal rent.  There may very well be claims against the Principals

arising out of these transactions, but there may also be intercompany claims arising against

Eastern in favor of B&W.  It is also unclear what assets each Debtor has that will enable each

Debtor to satisfy its separate creditor's claims.

The Eastern is also a surety on two debts on which B&W has defaulted.  With respect to one,

default judgment has already been entered against both B&W as the primary obligor and against

Eastern (and the La Villas) as surety.  With respect to the other, the action to recover against B&W and Eastern is currently subject to the automatic stay during the pendency of this proceeding.  The surety provision in the agreement that is the subject of that second action provides for payment of B&W's defaulted obligation out of the sureties' profit participations in future business ventures.  (Royal West Agreement § 3.)  If Eastern's reorganization efforts were to involve development of new projects (and counsel indicated at a hearing on November 2, 2020, that such projects were being pursued), that could certainly complicate the joint representation of both Debtors by a single law firm.

The inter-debtor claims and rights of contribution require careful scrutiny.  Accordingly, this must be an area of particular focus for the Subchapter V Trustee, and other estate fiduciaries, going forward in this case.

## IV.    CONCLUSION

For the reasons discussed above, the Amended Application to Employ Cushner & Associates, P.C., as Debtors' Attorneys is **DENIED**.

**IT IS SO ORDERED.**

Dated:    December 4, 2020
          New York, New York

_Martin Glenn_
MARTIN GLENN
United States Bankruptcy Judge